IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG

DIANNA WITTENBERG,

                Plaintiff,

v.                                      Civil Action No. 3:10-CV-58
                                      (BAILEY)

WELLS FARGO BANK, N.A.,
SAMUEL I. WHITE, P.C., and
SENECA TRUSTEES, INC.,

                Defendants.

## MEMORANDUM OPINION AND ORDER

Pending before this Court are plaintiff Dianna Wittenberg's Motion for Partial Summary Judgment against Defendants Samuel I. White, P.C. and Seneca Trustees, Inc. [Doc. 127]; defendant Wells Fargo Bank, N.A.'s Motion for Summary Judgment [Doc. 129]; defendants Seneca Trustees, Inc.'s and Samuel I. White, P.C.'s Motion for Summary Judgment [Doc. 130]; and the plaintiff's Motion for Partial Summary Judgment against Defendant Wells Fargo Bank, N.A. [Doc. 133], all filed November 7, 2011. Those motions have since been fully briefed and are now ripe for decision. This Court has reviewed the record and the motions and, for the reasons set out below, finds that the plaintiff's motions should be **DENIED** and the defendants' motions should be **GRANTED**.

1

## BACKGROUND

**I.    Undisputed Material Facts**

### A.    Borrower's Background

The borrower in this case, Dianna Wittenberg, has a bachelor's degree in business administration from the University of Northern Colorado. (Wittenberg Depo. at pp. 101:18-102:4). She also completed some basic law classes at the Denver Legal Institute. (Id. at pp. 102:9-103:10). Thereafter, she managed a regional of cable television system in Washington, D.C. for approximately ten years. (Id. at p. 104:2-12). In 1991, she and her now ex-husband, a Navy Pilot, moved to Europe for seven years. During that time, she did not work. (Id. at p. 104:15-105:5). Upon her return to the United States in 1998, she sold real estate for about a year until she was injured in a car accident from which she now receives Social Security Disability. (Id. at pp.110:12-111:11). Since 2000, she has been the owner of a leasing company called Regal, Inc., for which she sometimes negotiates leases with tenants. (Id. at pp.125:9-126:5).

### B.    Consummation of Loan

In 2005, Wittenberg met a First Independent Mortgage Company ("First Independent") employee named Andy Swanson at a financial seminar. Swanson indicated that he could get her a refinance loan with beneficial and favorable terms.

On February 17, 2006, Wittenberg contacted Swanson to refinance her loan and extract equity for outstanding expenses. By fax dated February 23, 2006, Wittenberg informed Swanson that she would like to use George Glass as a closing attorney. Wittenberg attended the closing scheduled for the same day, but refused to complete the closing. The next day, Wittenberg sent Swanson a fax explaining why she did not go

2

through with the closing.  Specifically, Wittenberg complained that she did not want an Adjustable Rate Mortgage ("ARM") and that the broker fee represented at closing did not reflect their previous discussions.

On March 13, 2006, First Independent arranged for an updated appraisal of Wittenberg's home that would serve as collateral for the refinance loan.  (Appraisal at p. 1).  By report dated March 15, 2006, Wittenberg's home was appraised at $640,000.  (Id.).

On March 20, 2006, Wittenberg sent an e-mail to Swanson asking for an update on when she could close on her loan.  A First Independent representative named Tricia Randall replied the same day and asked, "Can you sign on Monday the 27th @ 3pm?"  The next morning, March 21, 2006, Wittenberg confirmed that she would be available on the date proposed.  After Randall responded that she might be able to schedule an earlier closing, Wittenberg replied on March 21, 2006, at 9:41 p.m., asking whether the closing could be conducted at 2:30 p.m., on March 27, 2006.  Randall responded the next day, March 22, 2006, that the time change would be fine.

Thereafter, Wittenberg completed a five-page Fannie Mae Form 1003 application titled Uniform Residential Loan Application.  Her signature on the fourth page is dated March 22, 2006, while her signature on the fifth page is dated March 26, 2006; Swanson's signature on the fourth page is dated March 27, 2006.  (Loan Application at pp. 4 and 5). The first section on the first page describes the type of loan as a conventional mortgage and identifies its terms as a 30-year, adjustable rate mortgage for $416,000 at an interest rate of 5.87%.  (Id. at p. 1). The second section indicates that the purpose of the loan was to refinance and that the purpose of the refinance was "Cash-Out/Debt Consolidation." (Id.).  More specifically, Wittenberg  intended to pay off the $212,174 unpaid balance of the

3

mortgage loan on her home and the $67,527 unpaid balance of another loan.  (Id. at pp. 3-4).  In addition, Wittenberg would receive $125,069.02 in cash.  (Id. at p. 4).

On March 26, 2006, at 5:29 a.m., Wittenberg sent Swanson an e-mail asking him to call her "first thing."  After receiving neither a reply e-mail nor a phone call, Wittenberg sent Swanson another e-mail on March 27, 2006, at 12:15 p.m.  In the second e-mail, Wittenberg complained: "Why do I have to continually be placed on hold when costs change at the end of the loan process.  Please correct my brokerage fees back to what they have always been. $2700.  Who is messing up this loan continually?"  Less than an hour later, Randall replied that she had spoken to Swanson and that she would "get the origination fixed this morning and have new document [sic] sent over to title as I can."  On March 27, 2006, Wittenberg successfully closed on her loan.

### C.    Loan Documents

#### 1.    Note Dated March 21, 2006

Wittenberg executed a note dated March 21, 2006, with First Independent referencing loan number 26021701; however, written on top of the first page is the number 0150909596.  This note is a six-page Fannie Mae Form 3534 uniform instrument titled Adjustable Rate Note ("Note").  Pursuant to this fully transferable instrument, Wittenberg promised to pay First Independent $416,000 over 30 years at an initial fixed interest rate of 5.875%, amounting to an initial monthly principal and interest payment of $2,036.67 due beginning May 1, 2006 (property taxes and insurance were to be paid by borrower).  (March 21, 2006, Note at ¶¶ 1-3).  This instrument also indicated that the initial fixed interest rate would change to an adjustable interest rate on April 1, 2011, that would not be greater than 10.875% nor less than 2.75%.  (Id. at ¶ 4(A), (D)).  Pursuant to the standard

4

language of the form, Wittenberg agreed that if she did not pay the full amount of each monthly payment on the date it is due, she would be in default. (Id. at ¶ 7(B)).  In the event of default, the instrument required the holder of the Note to send Wittenberg a written notice informing her that if she did not pay the overdue amount by a certain date, the note holder could require her to pay immediately the full amount of the unpaid principal and all the interest owed on that amount.  (Id. at ¶ 7(C)).  Finally, the Note indicated that a deed of trust dated the same day would provide protection for the holder of the note should Wittenberg not keep the promises she made in this uniform instrument. (Id. at ¶ 11).  Wittenberg signed the Note without indicating a date of her signature.  (Id. at p. 6).  Below Wittenberg's signature, First Independent's chief financial officer provided his signature.  In addition, this area includes a stamp indicating that the Note would be paid to the order of Wells Fargo Bank, N.A. ("Wells Fargo").  This stamp is signed by Wells Fargo's assistant vice president.  (Id.).  The March 21, 2006, Note is the only note Wells Fargo has on file for Wittenberg.  (Wells Fargo 30(b)(6) Witness Mary Ellen Brust Depo. at p. 203:15-204:14).

### 2. Deed of Trust Dated March 21, 2006 and Amended to March 27, 2006

#### i.   Introductory Provisions

Wittenberg also executed a fifteen-page Fannie Mae Form 3049 uniform instrument titled Deed of Trust and dated March 21, 2006; however, the "21" is crossed out and replaced with "27" next to the initials "DW."  (Deed of Trust at p. 1).  This instrument purports to provide the security for the March 21, 2006, Note.  Again, however, the "21" is crossed out and replaced with "27" next to the initials "DW."  (Id. at p. 1).  This instrument identifies Wittenberg as the borrower, First Independent as the lender, Scully & Glass or

H. Charles Carl as the trustee, and Mortgage Electronic Registration Systems, Inc. ("MERS") as the nominee for the lender and the lender's successors and assignees. (Id.). The loan number given is the same as the March 21, 2006, Note:  26021701; however, written on the top of the first page of this instrument is "WF-150909596."  (Id.).  This instrument gave First Independent and any successor or assignee a security interest in Wittenberg's Charles Town, West Virginia, home.  (Id.).  The second page describes the note secured as having a principal amount of $416,000 and a maturity date of April 1, 2036, the same terms of the March 21, 2006, Note.  This page also indicates that an Adjustable Rate Rider was to be executed by Wittenberg.  (Id. at p. 2).

### ii.    Uniform Covenants

Beginning on the third page, the Deed of Trust lists twenty-one sections of "uniform covenants."  In Section 1 (titled "Payment of Principal Interest, Escrow Items, Prepayment Charges, and Late-Charges"), Wittenberg agreed to "pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note."  (Id. at § 1).

In Section 3 (titled "Funds for Escrow Items"), Wittenberg agreed to "pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the 'Funds') to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section

6

10."  (Id. at § 3).

In Section 19 (titled "Borrower's Right to Reinstate After Acceleration"), Wittenberg is granted the right to "have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument."  (Id. at § 19).  That right, however, is conditioned upon Wittenberg first "(a) pay[ing] Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cur[ing] any default of any other covenants or agreements; (c) pay[ing] all expenses incurred in enforcing this Security Instrument . . .; and (d) tak[ing] such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument . . .."  (Id.).

In Section 20 (titled "Sale of Note; Change of Loan Servicer, Notice of Grievance"), Wittenberg agreed that "[t]he Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower."  (Id. at § 20).  That section also explains that such a sale "might result in a change in the entity (known as the 'Loan Servicer') that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law," while indicating that "[t]here also might be one or more changes of the Loan Servicer unrelated to a sale of the Note."  (Id.).

### iii.    Non-Uniform Covenants

Beginning at the bottom of page eleven, the Deed of Trust listed eight sections containing "non-uniform covenants."  In Section 22 (titled "Acceleration; Remedies"), First

Independent and any successor or assignee agreed to be required to "give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument . . .." (Id. at § 22).  The parties further agreed that any such notice "shall specify: (1) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property." (Id.).  Section 22 also explains that "[i]f the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law." (Id.).  "If Lender invokes the power of sale," Section 22 continues, "Lender or Trustee shall give borrower, in the manner provided in Section 15, notice of Lender's election to sell the Property." (Id.).

In Section 27 (titled "Trustees and Substitution of Trustees"), Wittenberg agreed that "Lender may, at any time and from time to time hereafter, without notice, appoint and substitute another Trustee or Trustees, corporations or person, in place of the Trustee herein named to execute the trust herein created" and that "the new and substituted Trustee or Trustees in each instance shall be vested with all the rights, titles, interests, powers, duties and trusts in the premises which are vested in and conferred upon the Trustees herein named . . .." (Id. at § 27).  Section 27 further requires that "[e]ach such appointment and substitution shall be evidenced in writing which shall recite the parties to, and the book and page of record of, this Security Instrument, and the description of the real

8

property herein described, which instrument . . . shall be conclusive proof of the proper substitution and appointment of such successor Trustee or Trustees, and notice of such proper substitution and appointment to all parties in interest." (Id.)

The Deed of Trust concludes with Wittenberg's signature acknowledged on March 27, 2006.

### 3.    Fixed/Adjustable Rate Rider dated March 21, 2006, and Amended to March 27, 2006

As referenced on the second page of the Deed of Trust, Wittenberg also executed a four-page Fannie Mae Form 3182 instrument titled Fixed/Adjustable Rate Rider and dated March 21, 2006.  Like the Deed of Trust, however, the "21" is crossed out and replaced with "27" next to the initials "DW." (March 27, 2006, Fixed/Adjustable Rate Rider at p. 1).  This instrument indicates that "[t]he Note provides for an initial fixed interest rate of 5.875%," the same initial fixed interest rate contained in the March 21, 2006, Note.  (Id. at p. 1).  This instrument also provides that the initial fixed interest rate will change to an adjustable interest rate on April 1, 2011, the same change date in the March 21, 2006, Note. (Id.).  Like the March 21, 2006, Note, this instrument explains that the adjustable interest rate will never be greater than 10.875% nor less than 2.75%.  (Id. at p. 2).  Finally, this instrument contains a stamp that it was recorded along with the Deed of Trust in Jefferson County, West Virginia, on April 14, 2006.  (Id. at p. 4).

### 4.    Notice of Right to Cancel Signed March 27, 2006

On March 27, 2006, Wittenberg signed a Notice of Right to Cancel to acknowledge that she had received the same.  This agreement informed Wittenberg that she had "a legal right under federal law to cancel this transaction, without cost, within three business days

from whichever of the following events occurs last . . . the date of the transaction, which is March 27, 2006; . . . the date you receive your Truth in Lending disclosure; or . . . the date you receive this notice of your right to cancel."  (Notice of Right to Cancel at p. 1).

### 5.   Good Faith Estimate Prepared March 21, 2006, and Signed March 27, 2006

On March 27, 2006, Wittenberg signed a settlement statement titled Good Faith Estimate.  This statement, prepared March 21, 2006, indicated that the total loan amount was $416,000, the initial fixed interest rate was 5.875%, and the term of the loan was 30 years, amounting to a monthly principal and interest payment of $2,036.67, all terms identical to those contained in the March 21, 2006, Note.  (Good Faith Estimate at p. 1). This statement also specifies that two months of hazard insurance premiums and six months of taxes and assessment reserves would be deposited with First Independent. (Id.).  Finally, this statement estimated that $279,701.00 would pay off existing debt and that the remaining $121,526.82 (after paying the estimated closing costs and prepaid item/reserves) would be paid to Wittenberg in cash.

### 6.   Mortgage Loan Origination Agreement signed March 27, 2006

On March 27, 2006, Wittenberg entered into a one-page Mortgage Loan Origination Agreement with First Independent.   In this agreement, First Independent notified Wittenberg of its status as a licensed mortgage broker that "from time to time contract[s]" with "participating lenders." (Loan Origination Agreement at p. 1).  The agreement further indicates that First Independent was brokering Wittenberg's loan for Wells Fargo.

### 7.   WV Collateral Protection Insurance Notice signed March 27, 2006

On March 27, 2006, Wittenberg signed a one-page WV Collateral Protection

Insurance Notice dated March 21, 2006.  This notice informed Wittenberg that unless she provided First Independent with evidence of the insurance coverage required by the Deed of Trust, First Independent was authorized to purchase insurance at her expense to protect its interest in her collateral.  (Collateral Protection Insurance Notice at p. 1).

### 8.   Notice of Assignment, Sale or Transfer of Servicing Rights Dated March 21, 2006, and Signed March 27, 2006

On March 27, 2006, Wittenberg signed a two-page Notice of Assignment, Sale or Transfer of Servicing Rights.  Wittenberg was thereby notified that "the servicing of [her] mortgage loan, that is, the right to collect payments from [her], [was] being assigned, sold or transferred from" First Independent to Wells Fargo, effective May 1, 2006, the date that her first monthly payment would become due under the March 21, 2006, Note.  (Notice of Assignment, Sale or Transfer of Servicing Rights at p. 1).  The bottom of the first page indicated that Wittenberg's total monthly payment would be $2,387.67, composed of $2,036.67 for principal and interest, $261.80 for county property taxes, and $89.12 for hazard insurance premiums.  However, the tax and insurance figures were crossed out accompanied by the initials "DW."  Similarly, the total monthly payment figure was crossed out and replaced with $2,036.67.  (Id.).

### 9.   HUD-1 Statement

Finally, Wittenberg received a United States Department of Housing and Urban Development Final Settlement Statement, also known as a HUD-1 Statement.  This document lists the settlement date as March 27, 2006, and provides a breakdown of Wittenberg's closing costs as well as the distribution of the $416,000 principal.

D.      **Servicing of Loan**

1.      **Securitization of Loan**

Wells Fargo began servicing Wittenberg's loan on April 19, 2006.  (Brust Depo. at 206:1-5).  At that time, Wells Fargo assigned Wittenberg's loan the number 150909596.  (See Id. at 236:8-11).   On July 31, 2006, Wells Fargo, as servicer and securities administrator, entered into a Pooling and Servicing Agreement ("PSA") with Banc of America Funding Corporation ("BAFC"), as depositor, and U.S. Bank National Association ("U.S. Bank"), as trustee.  (PSA at p. 1).  Wittenberg's loan was included in this PSA.

2.      **Failure to Pay Real Estate Taxes / Escrow Account Established**

In October 2007, Wells Fargo was advised by a Jefferson County, West Virginia, tax collector that Wittenberg's property taxes were past due and that a tax sale certificate had been issued.  (Brust Depo. at pp. 108:19-109:4).  On October 16, 2007, Wells Fargo advanced payment to cure the tax delinquency.  (Id. at 166:20-167:4).  By letter dated October 18, 2007, Wells Fargo informed Wittenberg that it had paid the delinquent taxes plus interest/penalty due.  In this letter, Wells Fargo indicated that "[a]n escrow account ha[d] been established on [her] behalf for the collection of the amount advanced to bring [her] taxes current, as well as to pay all future tax bills for the life of [her] loan."  (Oct. 18, 2007, Letter at 1).   In this regard, Wells Fargo explained that Wittenberg's "monthly mortgage payment [would] increase to repay the advance and to establish the escrow account."  (Id.).  On October 23, 2007, Wells Fargo sent Wittenberg a nearly identical letter indicating that it had paid additional delinquent property taxes.

In November 2007, Wells Fargo discovered that the August 2007 installment also was past due, paid that installment, and added the amount to Wittenberg's already negative

escrow account.  According to Wittenberg, she did not plan to pay the August 2007 installment until September 2008 because it was her practice to pay her taxes for the second half of one year in September of the following year.  (Wittenberg Depo. at p. 89).

On February 25, 2008, Wittenberg paid approximately one-third of the amount due in her escrow account.  As a result, Wells Fargo sent Wittenberg an Escrow Deficiency Notice on March 10, 2008.  When the deficiency went unpaid, Wells Fargo sent Wittenberg another Escrow Deficiency Notice on August 8, 2008.  The latter notice indicated that Wittenberg had "an escrow deficiency for the payment of taxes and/or lender placed insurance in the amount of $3039.49."  (Aug. 8, 2008, Escrow Deficiency Notice at 1).  Wells Fargo further explained that it had "adjusted [her] payment to spread this amount over 12 payments beginning with her payment due 10/01/08." (Id.).  Specifically, the notice outlined that an "Escrow Deficiency Spread" of $235.29 had been added to Wittenberg's principal and interest payment of $2,036.67 for an adjusted total payment of $2,289.96. (Id.).

By letter dated October 9, 2008, Wells Fargo informed Wittenberg that a search of her tax records indicated that she was delinquent in the amount of $11,627.82.  The letter further provided that if proof of payment was not received by November 11, 2008, Wells Fargo would advance the money for payment of the Wittenberg's delinquent taxes.  By letter dated December 17, 2008, Wells Fargo notified Wittenberg that because she failed to provide the proof of payment requested, it had paid the delinquent real estate taxes and all applicable interest/penalty due.  According to an escrow statement dated December 19, 2008, this advance in payment required that Wittenberg's monthly mortgage payment be adjusted to $2,813.11.

13

### 3.     Requests for Loan Modification / Proposed Modifications

After failing to make her December 2008 payment, Wittenberg called Wells Fargo on December 22, 2008, and spoke to a representative who identified herself as Leann Miller. (Wittenberg Depo. at pp. 16:9-17:11). During this phone conversation, Wittenberg indicated that she wished to pursue a loan modification.

By letter dated December 22, 2008, Miller confirmed that Wittenberg had called to inquire about a modification of loan number 01050909596, the number written on top of the March 27, 2006, Deed of Trust and the March 21, 2006, Note. Miller explained that "not only must [Wells Fargo] service the mortgage loan in accordance with the terms of the Note and the Security Instrument, but also by the guidelines established by the investor." (Dec. 22, 2008, Letter at p. 1). To determine if Wittenberg qualified, Miller asked that she provide certain financial information by December 31, 2008. This letter was delivered to Wittenberg on or before December 24, 2008. In late December 2008 or early January 2009, Wittenberg provided the requested information. (Wittenberg Depo. at p. 18:7-13).

By letter dated February 11, 2009, Miller advised Wittenberg that a modification of her loan numbered 0150909596 had been approved. By separate letter dated February 11, 2009, Wells Fargo confirmed its approval of a loan modification and provided a copy of the modification agreement for Wittenberg to execute and return. Pursuant to the proposed agreement, Wittenberg's loan would be modified as follows. Beginning on April 1, 2009, the plaintiff would be required to make a monthly payment of $2,433.37. That payment would be composed of a principal and interest payment amount of $2,164.09 (approximately $130 higher than the original principal and interest payment) and a required escrow payment of $269.28. The modified interest rate would be 4.00% (nearly 2.00%

14

lower than the initial interest rate) and the modified maturity date would be July 1, 2036 (three months longer than the initial term). The modified principal balance would be $431,276.80 (approximately $15,000 more than the initial principal balance). The proposed agreement referenced the loan origination date as March 21, 2006.

In response, Wittenberg called Wells Fargo on February 18, 2009, to complain that the modified monthly payment was too high. Miller and Wittenberg spoke again on March 23, 2009. At that time, Miller explained that the modified monthly payment amount of $2,433.37 was the result of Wittenberg's escrow deficiency. In late March 2009, a Wells Fargo representative named Tina Marshall orally offered to amend the interest rate on the proposed modification to 3.00%. (Wittenberg Depo. at pp. 20:15-21:2). Wittenberg rejected this offer as well. (Id. at 21:3-6).

Instead, by letter dated April 2, 2009, Wittenberg complained that both offers increased her principal balance, monthly payment amount, and the term of the loan. In that letter, Wittenberg asked Wells Fargo to "produce both loan instruments pertaining to [her] mortgage," arguing that it was her "right to see who holds the Note and who is holding the Mortgage or Deed of Trust." (Apr. 2, 2009, Letter at 2). Wittenberg further requested that Wells Fargo provide a more affordable loan modification without regard for the guidelines of its investor, which Wittenberg presumed to be Bank of America, N.A. ("BofA"). In this regard, Wittenberg has since indicated that she was only interested in a loan modification that lowered her principal balance and monthly payment amount. (Wittenberg Depo. at p. 24:6-17).

By letter dated May 11, 2009, Wells Fargo responded to Wittenberg's April 2, 2009, letter. (Wittenberg Depo. Ex. 4). First, Wells Fargo offered another modification

15

agreement.  This agreement reduced the interest rate to 2.00%, decreased the monthly principal and interest payment amount to $1,750.81, and moved the next payment due to July 1, 2009.  (Id. at 1).  The agreement provided referenced the "Note and Mortgage dated 3/21/2006."  (Id.).  In addition, Wells Fargo stated that it had enclosed the Note and Deed of Trust.  By letter dated May 15, 2009, Wittenberg advised that the proposed modification could not be accepted or denied, complaining that the increase in her principal balance had not been adequately explained.  (Wittenberg Depo. Ex. 6).

On June 2, 2009, Wittenberg spoke to representative at Wells Fargo named Chris Bise.  (Wittenberg Depo. at p. 31:15-19).  During this phone conversation, Wittenberg indicated that she did not intend to provide updated financial information, she believed that Wells Fargo had overpaid her taxes, and that she thought she should be offered a loan modification pursuant to the Home Affordable Modification Program ("HAMP").  (Id. at pp. 31:20-32:8).  Wittenberg also asserted that it would not be acceptable for Wells Fargo to offer a modification increasing her principle balance, even though she had been told that the principle balance had to be increased so that taxes and escrow could be capitalized. (Id. at pp. 32:9-13; 33:7-11).  Following this conversation, Wittenberg faxed another letter to Wells Fargo, arguing that her taxes were overpaid causing her principal balance to be inflated in the recent modification agreement.  (Wittenberg Depo. Ex. 5).  In addition, Wittenberg claimed that the Note and Deed of Trust were not enclosed on May 11, 2009, as represented.

On June 9, 2009, Wittenberg's counsel sent Wells Fargo a nineteen-page letter titled "Qualified Written Request, Complaint, Dispute of Debt & Validation of Debt Letter, Cease & Desist Letter."   The letter made several requests for documents and information

16

concerning the origination, securitization, assignment, and servicing of Wittenberg's loan. The next day, Wittenberg's counsel sent Wells Fargo a substantially identical fourteen-page letter.

By letter dated August 3, 2009, Wells Fargo responded to the requests of Wittenberg's counsel. (Wittenberg Depo. Ex. 7). First, Wells Fargo indicated that the loan had been originated on March 21, 2006, and that the loan was subsequently transferred to Wells Fargo on April 19, 2006. (Id. at 1). Second, Wells Fargo enclosed a Customer Account Activity Statement reflecting a complete payment history for the period of June 28, 2006, though July 16, 2009. (Id. at 3-5). Third, Wells Fargo enclosed a copy of the March 21, 2006, Note and the March 27, 2006, Deed of Trust. (Id. at 6-27). Finally, Wells Fargo stated that "after a thorough review of the financial information provided, a decision was made on July 9, 2009, that we are unable to offer a loan modification or any other workout options at this time . . . because of the current income deficit of $279.97 . . . [which] cannot be overcome by any modification the loan may currently qualify for." (Id. at 2).

By cover letter dated September 14, 2009, Wittenberg sent the first of three hardship letters to Wells Fargo and renewed her request for a loan modification. (Wittenberg Depo. Ex. 8). Wittenberg also provided updated financial information on September 16, 2009. (Wittenberg Depo. Ex. 9). On September 18, 2009, Wells Fargo indicated that it had received Wittenberg's request for a loan modification and that her request was under review. However, by letter dated October 30, 2009, Wells Fargo denied Wittenberg's request, explaining that she "did not provide . . . all of the information needed within the time frame required . . .." (Wittenberg Depo. Ex. 10 at 2). Wittenberg challenged this reason for denial by faxed letter dated November 13, 2009, arguing that she had provided

17

all necessary financial information.  (Id. at 1).

### 4.    Special Forbearance Agreement

On December 22, 2009, Wittenberg sent the second of three hardship letters to Wells Fargo and again sought a modification.  (Wittenberg Depo. Ex. 11).  On December 31, 2009, Wittenberg spoke to a Wells Fargo negotiator about entering into a trial modification period.   (Wittenberg Depo. at pp. 61:3-62:3, 63:6-17).   During this conversation, the negotiator reviewed Wittenberg's financials and indicated that she would receive a permanent loan modification upon successful completion of the trial period and the submission of additional documentation.  (Id. at p. 65:6-15).  Wittenberg and the negotiator did not discuss the terms of any permanent loan modification.  (Id. at p. 114:14-16).

By letter dated January 4, 2010, Wells Fargo offered Wittenberg a Special Forbearance Agreement ("SFA"), which she believed to incorporate the agreement discussed during the December 31, 2009, phone conversation.  (Wittenberg Depo. Ex. 12; Wittenberg Depo. at p. 61:3-7, 62:4-6, 63:20-64:11, 72:9-14, 73:15-21).   The letter indicated that the SFA was "not a waiver of the accrued or future payments that become due, but a trial period showing you can make regular monthly payments" and noted that "investor approval is still pending."  (Wittenberg Depo. Ex. 12 at 2).  Finally, the letter explained:

> Upon successful completion of the [SFA], your loan will not be contractually current.  Since the installments may be less than the total amount due, you may still have outstanding payments and fees.  Any outstanding payments and fees will be reviewed for a loan modification.  If approved for a loan modification, based on investor guidelines, this will satisfy the remaining past

18

due payments on your loan and we will send you a loan modification
agreement.  An additional contribution may be required.

(Id.).  Wittenberg read, executed, and returned the SFA on January 20, 2010.  (Wittenberg

Depo. at p. 66:14-16; Wittenberg Depo. Ex. 13).

The SFA provided for three trial payments of $1,570.83 due on the first of February,

March, and April 2010.  (SFA at § 5).  This monthly payment was the amount the negotiator

had worked up during the December 31, 2009, phone conversation.  (Wittenberg Depo. at

p. 67:5-8).  In addition, the SFA provided as follows:

> This plan is an agreement to temporarily accept reduced payments or
> maintain regular monthly payments during the plan specified below.  Upon
> successful completion of the outlined payments, your loan will be reviewed
> for a Loan Modification.  Based on investor approval, this may satisfy the
> remaining past due amount on your loan.
>
> The lender is under no obligation to enter into any further agreement, and
> this forbearance shall not constitute a waiver of the lender's right to insist
> upon strict performance in the future.
>
> All of the provisions of the note and security instrument, except as herein
> provided, shall remain in full force and effect. . . . The lender, at its option,
> may institute foreclosure proceedings according to the terms of the note and
> security instrument without regard to this agreement.

(SFA at §§ 2-4).

Thereafter, Wittenberg made the three payments required by the SFA, but did not

receive a loan modification.  (Brust Depo. at pp. 136:4-6, 153:16-21, 154:11-14).  After

19

reviewing Wittenberg's file on April 8, 2010, Wells Fargo determined that it needed more information, including proof of income. (Brust Depo. at p. 156:7-15). The next day, Wells Fargo called the law firm of Wittenberg's counsel twice to advise that it needed updated documentation. (Id. at 156:16-157:2). When there was no response, Wells Fargo sent Wittenberg a letter dated April 13, 2010, indicating that it had reviewed the information she had previously provided but that it could not offer a loan modification because it needed further input from her: "We can only process a loan modification with input from you. We have been unable to reach you to discuss your situation. For that reason, you have not been approved for a mortgage loan modification." (Id. at p. 157:2-7; Apr. 13, 2010, Letter at p. 1). Wittenberg knew that she would need to provide additional information upon the successful completion of the trial period. (Wittenberg Depo. at pp. 70:7-8, 75:4-9, 79:19-80:1).

Wittenberg sent Wells Fargo a final hardship letter on April 22, 2010. (Wittenberg Depo. Ex. 14). By letter dated April 23, 2010, Wells Fargo explained that Wittenberg "may be eligible for a . . . 'Short Sale,'" which it defined as "a workout program that allows a borrower to sell the property, even if the proceeds are less than the loan payoff, due to low property value." (April 23, 2010, Letter at p. 1). In addition, Wells Fargo sent Wittenberg a letter dated April 26, 2010, indicating that it would again work with her to determine what options may be available and provided a list of the items it would need to make such a determination. (Wittenberg Depo. Ex. 15 at 1). The letter further advised that it was "imperative" that Wells Fargo receive the information by May 3, 2010. (Id.). After Wittenberg failed to provide the requested information, Wells Fargo sent a follow-up letter dated May 4, 2010. (Wittenberg Depo. Ex. 16). In this letter, Wells Fargo told Wittenberg

20

that it was "unable to continue exploring workout options available for [her] loan and [that it had] closed her file" because it did "not have record of receiving the financial information requested from [her] on April 26, 2010."  (Id. at 1).

By letter dated May 14, 2010, Wells Fargo once again asked that Wittenberg provide the documentation required to consider workout options, this time by May 20, 2010.  When Wittenberg failed to do so, Wells Fargo sent a follow-up letter dated May 21, 2010. Wittenberg did not provide the requested information and instead opted to file this action on June 8, 2010.  Wittenberg has not provided Wells Fargo with updated financials since January 2010.  (Wittenberg Depo. at p. 82:15-83:8).

### E.   Trustee Assignments, Debt Collection Attempts, and Foreclosure Efforts

#### 1.   Samuel I. White, P.C.

By letter dated July 20, 2009, Samuel I. White, P.C. ("SIW") sent Wittenberg a letter on behalf of Wells Fargo seeking to collect the principal balance of her loan, $439,572.64. The letter further provided:

> [U]nless you, within thirty (30) days after receipt of this notice, dispute the validity of the debt or any portion thereof, the debt will be assumed to be valid by this firm.  If you notify this firm in writing within the thirty (30) day period that the debt, or any portion thereof, is disputed, this firm will obtain verification of the debt and a copy of such verification will be mailed to you by this firm.

(July 20, 2009, Letter at p. 1).  In response, Wittenberg's counsel sent SIW a letter titled "Letter of Representation; Dispute & Validation of Debt Letter."  This letter notified SIW that Wittenberg was "disputing the debt allegedly owed to [Wells Fargo]" and requested "proof

of [Wells Fargo's] ownership and/or entitlement right." (July 20, 2009, Letter at p. 1). This letter further informed SIW that Wittenberg had sent a letter to Wells Fargo on June 25, 2009, requesting "closing documents as well as any documents evidencing a transfer or assignment of the subject loan." (Id.). Finally, this letter requested "a complete and itemized transaction history of the subject loan" because "Wittenberg disputes that she is in default since there seem to be irregularities in how her payments have been applied since the inception of the loan." (Id. at 2).

On August 4, 2009, SIW sent a fax to Wittenberg's counsel indicating that $23,838.57 must be received by August 21, 2009, for reinstatement. This fax also stated: "Additionally, we have forwarded your July 30, 2009, correspondence to Wells Fargo Home Mortgage, and requested from Wells Fargo Home Mortgage the note and payment history. Once received we will forward the aforesaid to you." (Aug. 4, 2009, Fax at p. 1). On August 11, 2009, SIW faxed Wittenberg's counsel a copy of the payment history on Wittenberg's loan. The next day, SIW faxed Wittenberg's counsel a copy of the March 21, 2006, Note as proof of its entitlement to collect on the loan.

## 2. Seneca Trustees, Inc.

The Deed of Trust lists Scully & Glass or B. Charles Carl, III as the Trustee, but allows the Trustee to be substituted "at any time and from time to time . . . without notice . . .." (Deed of Trust at § 27). On August 18, 2009, SIW recorded a Corporate Assignment of Deed of Trust  referencing a deed of trust dated March 21, 2006, but corrected by hand to read March 27, 2006. This instrument purports to assign Wittenberg's Deed of Trust to U.S. National Bank, as Trustee for Banc of America Funding Corporation 2006-G, effective July 31, 2009.

22

On August 25, 2009, SIW recorded a Substitution of Trustee dated March 21, 2006. On August 31, 2009, SIW recorded a Corrected Substitution of Trustee dated March 27, 2006 (with the day of the month handwritten).  Both instruments purport to remove Scully & Class or H. Charles Carl, III as Trustee and appoint Seneca Trustees, Inc. ("Seneca").

By letter dated September 2, 2009, Seneca notified Wittenberg that she could reinstate her loan for $26,651.68, if received on or before a September 15, 2009, foreclosure sale.  On September 9, 2009, however, Seneca rescheduled the foreclosure sale for October 13, 2009, and notified Wittenberg on September 11, 2009, of the same. Again, on September 24, 2009, Seneca continued the foreclosure sale until October 20, 2009.

By letter dated October 7, 2009, Seneca notified Wittenberg that she could reinstate her loan for $26,651.68, if received by the October 20, 2009, foreclosure sale.  On October 8, 2009, however, Seneca moved the foreclosure sale to October 28, 2009.

By letter dated November 18, 2009, Seneca notified Wittenberg that she could reinstate her loan for $29,904.61, if received by a December 8, 2009, foreclosure sale.  On December 2, 2009, Seneca sent Wittenberg a copy of the Fixed/Adjustable Rate Rider dated March 21, 2006, but changed to March 27, 2006, beside the initials "DW."  The foreclosure sale scheduled for December 8, 2009, never took place.

At some point thereafter, Seneca scheduled Wittenberg's home to be sold at foreclosure on January 13, 2010, which Seneca cancelled by letter dated January 6, 2010, two days after Wittenberg was offered the Special Forbearance Agreement.  Six months later, Seneca reset the foreclosure sale for July 20, 2010.  Notice of this sale was published in the July 1, 2010, issue of *The Journal*, a newspaper in Martinsburg, West Virginia.

However, by fax dated July 13, 2010, Seneca cancelled the sale.

## II.   <u>Procedural History</u>

On June 8, 2010, Wittenberg filed suit in this Court against First Independent (Original Lender), Wells Fargo (Servicer), MERS (Nominal Lender), Seneca (Substitute Trustee), SIW (Debt Collection Firm), U.S. Bank (PSA Trustee), BofA (Investor), George Glass (Closing Attorney), and Cameron Title, LLC (Title Insurer) [Doc. 1].  Wittenberg also generically named John Does 1 through 50, which she has alleged are "investors, mortgage aggregators (wholesalers), mortgage originators, loan sellers, Trustees of Pooled Assets, and Trustees for holders of certificates of Collateralized Mortgage Obligations . . .."  ([Doc. 65] at ¶ 17).

By Order dated November 18, 2010, this Court granted summary judgment in favor of Cameron Title, LLC ("Cameron Title") [Doc. 48].  Specifically, this Court held that Wittenberg's claims against Cameron Title, a title insurer whose sole involvement in the subject loan transaction was to provide lender's title insurance, failed as a matter of law. Cameron Title was dismissed with prejudice.

On December 30, 2010, this Court dismissed George Glass, finding that Wittenberg's claims for breach of fiduciary duty and negligence failed as a matter of law [Doc. 58].  This Court explained its decision to dismiss a claim that Glass breached his fiduciary duty and committed negligence by allegedly failing to shred, and instead providing her lender and servicer with, the March 21, 2006, Note, as follows:

> [T]he plaintiff has not once alleged that the terms of the March 21, 2006, Note differ in any way from those in the March 27, 2006, Note.  Instead, it appears from her allegations, which is all that matters at this stage, that the

plaintiff pursues this claim based solely on the fact that the Notes are dated six days apart.  That will not suffice to survive a 12(b)(6) motion to dismiss.

. . .

For the same reasons outlined above, this Court finds that the plaintiff has failed to adequately allege how she has been harmed by Glass' alleged failure to preserve the Note from the completed closing, and by extension, his providing her lender and servicer with the Note from the aborted closing.

(Id. at 10, 11).  Glass was dismissed with prejudice.

On February 4, 2011, Wittenberg filed a First Amended Complaint [Doc. 65], containing thirteen (13) causes of action against the remaining defendants, either jointly or individually: (Count I) violations of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et seq.*; (Count II) violations of the Federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, and 12 C.F.R. § 226 ("Regulation Z"); (Count III) civil conspiracy; (Count IV) breach of contract/implied covenant of good faith and fair dealing (Count V) unjust enrichment; (Count VI) fraud; (Count VII) breach of fiduciary duty; (Count VIII) negligence; (Counts IX) fraudulent, deceptive, or misleading representations in violation of the West Virginia Consumer Credit and Protection Act ("WVCCPA"), W.Va. Code § 46A-1-101, *et seq.*; (Count X) violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692a, *et seq.*; (Count XI) unfair or deceptive trade practices in violation of the WVCCPA; (Count XII) slander of title; and (Count XIII) declaratory judgment.

Between February 14, 2011, and February 23, 2011, First Independent, Wells Fargo, MERS, and U.S. Bank moved to dismiss the First Amended Complaint for failure to state

a claim against them upon which relief can be granted [Docs. 66, 68, 73, & 75].  On April 11, 2011, this Court entered a Memorandum Opinion and Order [Doc. 94], granting dismissal on all claims against those defendants except a portion of Wittenberg's breach of contract claim against Wells Fargo.

This Court dismissed the following claims: (1) the civil conspiracy claim against all movants as unsupported by allegations of an unlawful purpose; (2)  the TILA claim against all movants as time-barred; (3) the negligence claims against all movants as unsupported by an allegation of injury and time-barred; (4) the fraud claim against First Independent, Wells Fargo, and MERS as untimely and insufficiently pled; (5) the fraudulent, deceptive, or misleading representations claim against First Independent, Wells Fargo, and MERS as insufficiently pled and preempted by the National Bank Act ("NBA") to the extent alleged against Wells Fargo; (6) the unjust enrichment claim against First Independent, Wells Fargo, and U.S. Bank as unsupported by allegations of inequitable benefits; (7) the RESPA claims against First Independent and Wells Fargo as unsupported by a private cause of action in part and unsupported an allegation of pecuniary loss in part; (8) the breach of fiduciary duty claim against First Independent and Wells Fargo as untimely and unsupported by an allegation of a special relationship; (9) the slander of title claim against First Independent and Wells Fargo as unsupported by an allegation of a wrongful recording of an unfounded claim on her property; (10) the declaratory judgment action against MERS and U.S. Bank after rejecting Wittenberg's argument that the securitization of her mortgage loan rendered her Note unenforceable; (11) the breach of contract/implied covenant of good faith and fair dealing claim against Wells Fargo to the extent that it relies upon the HAMP, a Servicer Participation Agreement, or the Pooling and Servicing Agreement.

26

Accordingly, U.S. Bank, First Independent, and MERS were dismissed with prejudice.

This Court allowed the following claims to proceed: (1) the breach of contract/implied covenant of good faith and fair dealing claim against Wells Fargo to the extent that it relies upon a contract formed during a traditional trial modification; and (2) a claim for unfair or deceptive trade practices against Wells Fargo wholly derivative of the breach of contract claim.

On April 7, 2011, BofA moved to dismiss the First Amended Complaint for failure to state a claim against it upon which relief can be granted [Doc. 91].  By Order dated May 5, 2011 [Doc. 100], this Court granted BofA's motion for the same reasons already articulated in its April 11, 2011, Memorandum Opinion and Order.  BofA was dismissed with prejudice. Neither Seneca nor SIW moved to dismiss the First Amended Complaint.

On June 2, 2011, this Court dismissed John Does 1 through 50 without prejudice, noting that the May 31, 2011, discovery deadline had passed [Doc. 101].  Though the discovery deadline was subsequently twice extended [Docs. 103 & 106], Wittenberg has not moved to identify John Does 1 through 50.  After an unsuccessful mediation on October 19, 2011 [Doc. 121], discovery was completed on October 21, 2011 [Doc. 106].

Thereafter, Wittenberg, Wells Fargo, Seneca, and SIW filed the following dispositive motions on November 7, 2011.

## A.    Wittenberg's Motion for Partial Summary Judgment against Seneca and SIW

Wittenberg moves for summary judgment against Seneca on her breach of fiduciary duty claim, against SIW on her FDCPA claim, and against both defendants on her fraudulent, deceptive, or misleading representations claim.  In support of her motion,

27

Wittenberg argues that the facts uncovered in discovery show that these defendants acted upon a deed of trust securing a note that has not been produced and that Wells Fargo claims it does not have in its possession, a note dated March 27, 2006.

### B.   Wells Fargo's Motion for Summary Judgment

Wells Fargo moves for summary judgment on the two claims remaining against it, namely: (1) the breach of contract/implied covenant of good faith and fair dealing claim based upon a contract formed during a traditional trial modification; and (2) the wholly derivative claim for unfair or deceptive trade practices.  In support of its motion, Wells Fargo argues that the Special Forbearance Agreement, which Wittenberg has testified she understood to incorporate the traditional trial modification she alleged was breached, shows that there is no genuine issue of material fact on either claim.

### C.   Seneca's and SIW's Motion for Summary Judgment

Seneca and SIW move for summary judgment on all claims remaining against them, including the claims which are the subject of Wittenberg's motion.  Seneca argues that the breach of fiduciary duty claim seeks to improperly expand the role of a trustee in a deed of trust.  SIW argues that it is entitled to summary judgment on the FDCPA claim because it adequately and properly verified the debt.  Both defendants argue that their reliance on the March 21, 2006, Note cannot support the fraudulent, deceptive, or misleading representations claim because it is undisputed that Wittenberg had defaulted on her loan.

### D.   Wittenberg's Motion for Partial Summary Judgment Against Wells Fargo

Wittenberg moves to reinstate, and for summary judgment on, her claim for fraudulent, deceptive, or misleading representations against Wells Fargo, which this Court

dismissed as inadequately pled and preempted by the NBA on April 11, 2011.  In support

of her motion, Wittenberg argues that this Court has subsequently changed its stance on

NBA preemption and discovery has revealed the invalidity of the March 21, 2006, Note.

These motions have been ripe for decision since mid-December 2011.  A pretrial

conference is currently scheduled for February 17, 2012, to be followed by a jury trial on

February 28, 2012.

**DISCUSSION**

**I.**     **Summary Judgment Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see **Celotex Corp. v. Catrett***, 477

U.S. 317, 322 (1986).  A genuine issue exists "if the evidence is such that a reasonable jury

could return a verdict for the non-moving party."  ***Anderson v. Liberty Lobby, Inc.***, 477

U.S. 242, 250 (1986).  Thus, the Court must conduct "the threshold inquiry of determining

whether there is the need for a trial-- whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may reasonably

be resolved in favor of either party."  ***Id.*** at 250.

The party opposing summary judgment "must do more than simply show that there

is some metaphysical doubt as to the material facts."  ***Matsushita Elec. Indus. Co., Ltd.***

***v. Zenith Radio Corp.***, 475 U.S. 574, 586 (1986).  That is, once the movant has met its

burden to show absence of material fact, the party opposing summary judgment must then

come forward with affidavits or other evidence demonstrating there is indeed a genuine

29

issue for trial.  Fed. R. Civ. P. 56(c);  **Celotex Corp.**, 477 U.S. at 323-25; **Anderson**, 477 U.S. at 248.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  **Anderson**, 477 U.S. at 249 (citations omitted).

## II.   Analysis

### A.   Wells Fargo Motion for Summary Judgment

#### 1.   Count IV – Breach of Contract

In Count IV, Wittenberg claims that Wells Fargo breached a contract formed during a traditional trial modification by failing to offer a permanent modification after she successfully made three trial payments.  In support of this claim, Wittenberg alleges the following: (1) in February 2010, Wells Fargo informed her that she qualified for a $1,570.00 monthly payment and promised that if she made timely payments for three months, the modification would become permanent; (2) she timely made the three agreed-upon payments; (3) in May 2010, however, Wells Fargo informed her that it had placed her in active foreclosure status again; and (4) also in May 2010, a Wells Fargo representative informed her that the modification offer had been a "traditional modification" and that Wells Fargo was "uncertain whether her investor would participate under HAMP."  ([Doc. 65] at ¶¶ 75-77, 79).

In denying Well's Fargo's motion to dismiss this claim, this Court found that the plaintiff had stated an express breach of contract claim by alleging that Wells Fargo denied a permanent loan modification even though it had promised one if she paid three trial payments.

After discovery, it is undisputed that the agreement alleged was fully incorporated in a written Special Forbearance Agreement ("SFA") offered to Wittenberg on January 4,

2010, and reviewed, executed, and returned by her on January 20, 2010.  Thus, to survive summary judgment on this claim Wittenberg must present a genuine issue of material fact that Wells Fargo breached the SFA.  As explained below, however, she has failed to make the requisite showing.

In West Virginia, the elements of breach of contract are (1) a contract exists between the parties; (2) a defendant failed to comply with a term in the contract; and (3) damage arose from the breach.  *See Wince v. Easterbrooke Cellular, Corp.*, 681 F.Supp.2d 688, 693 (N.D. W.Va. 2010).  When determining whether a defendant failed to comply with a term in the contract, a court is required to construe the contract in question according to the plain and unambiguous language used.  *See Fifth Third Bank v. McClure Properties, Inc.*, 724 F.Supp.2d 598, 605 (S.D. W.Va. 2010).  In making this determination, a court should find language ambiguous only when "it is reasonably susceptible to more than one meaning in light of the surrounding circumstances and after apply the established rules of construction."  *FOP, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 468 S.E.2d 712, 716 (1996).

Here, the SFA plainly and unambiguously stated that the purpose of the agreement was exclusively to "*temporarily* accept reduced payments or maintain regular monthly payments."  (SFA at § 2) (emphasis added).  In addition, Wells Fargo was careful to explain in the SFA that it was only upon "investor approval" that successful completion of the trial plan "*may* satisfy the remaining past due amount" on Wittenberg's loan.  (Id.) (emphasis added).  Similarly, Wells Fargo cautioned that, "at its option, [it] may institute foreclosure proceedings according to the terms of the note and security instrument *without regard to* this agreement."  (Id. at § 4) (emphasis added).  Finally, and perhaps most importantly, the

31

SFA provided in plain and unambiguous terms that Wells Fargo was "*under no obligation* to enter into any further agreement, and [that] this forbearance *shall not constitute a waiver* of [Wells Fargo's] right to insist upon strict performance in the future."   (Id. at § 3) (emphasis added).

Based upon these plain and unambiguous terms, this Court holds that Wittenberg has failed to present a genuine issue of material fact that Wells Fargo breached the SFA when it decided not to give her a permanent loan modification upon successful completion of the trial period.   Accordingly, this Court hereby **DISMISSES** Count IV (Breach of Contract) to the extent that it claims an express breach of the SFA.

### 2.    Count IV –  Breach of Implied Covenant of Good Faith and Fair Dealing

West Virginia does not recognize a stand-alone cause of action for failure to exercise contractual discretion in good faith.  *See **Corder v. Countrywide Home Loans, Inc.**,* 2011 WL 289343, *4 (S.D. W.Va. Jan 26, 2011). As such, a claim for breach of the implied covenant of good faith and fair dealing can only survive if the borrower pleads an express breach of contract claim.  *See e.g., **Clendenin v. Wells Fargo Bank, N.A.**,* 2009 WL 4263506, *5 (S.D. W.Va. Nov. 24, 2009) (holding that the bad faith claim "will live or die by the [express] breach-of-contract claim . . ..").

In light of the ruling above, there is no longer a viable express breach of contract claim in this case.  Thus, as a matter of law, there can be no claim for breach of the implied covenant of good faith and fair dealing.  Accordingly, this Court hereby **DISMISSES** Count IV (Breach of Implied Covenant of Good Faith and Fair Dealing).

### 3.    Count IX –  Unfair or Deceptive Trade Practices

As alluded to above and explained in its April 11, 2011 Memorandum Opinion and Order, this Court allowed Wittenberg's claim for unfair or deceptive trade practices to proceed as one wholly derivative of the claim for breach of contract.  To the extent this Court has ruled above that Wittenberg has failed to make a sufficient showing that Wells Fargo breached the SFA, this claim fails as well.  Accordingly, this Court hereby **DISMISSES** Count IX (Unfair or Deceptive Trade Practices).

### B.    Seneca, SIW, and Wittenberg Cross Motions for Summary Judgment

### 1.    Claims vs. Seneca (Substitute Trustee)

### i.    Count VII – Breach of Fiduciary Duty

In Count VII, Wittenberg claims that Seneca breached the fiduciary duty it owed to her as a substitute trustee by: (1) "failing to verify the validity of the March 21, 2006 [Note] before initiating foreclosure proceedings against [her];" and (2) "attempting to foreclose on [her] property" based upon an invalid note.  ([Doc. 65] at ¶¶ 170-171).

The Deed of Trust permits the lender or the lender's assignee to have the trustee or substitute trustee "invoke the power of sale" if a default remains uncured after proper notice of default.  (Deed of Trust at § 22).  In addition, W.Va. Code § 38-1-3 provides, in whole, that:

> The trustee in any trust deed given as security shall, whenever required by any creditor secured or any surety indemnified by the deed, or the assignee or personal representative of any such creditor or surety, after the debt due to such creditor or for which such surety may be liable shall have become payable and default shall have been made in the payment thereof, or any part thereof, by the grantor or other person owing such debt, and if all other conditions precedent to sale by the trustee, as expressed in the trust deed, shall have happened, sell the property conveyed by the deed, or so much thereof as may be necessary, at public auction, having first given notice of

33

such sale as prescribed in the following section [§ 38-1-4].

Interpreting this language, the Supreme Court of Appeals of West Virginia has held that "the fiduciary duty owed by the trustee in a trust deed given as security in connection with a home mortgage loan does not require the trustee to review account records to ascertain the actual amount due prior to foreclosing . . .." *Lucas v. Fairbanks Capital Corp.*, 217 W.Va. 479, 488, 618 S.E.2d 488, 497 (2005).  In that same case, the Supreme Court of Appeals also held that "nothing in the language of W.Va. Code § 38-1-3 . . . suggest[s] that a trustee has a duty to consider objections to the foreclosure sale." *Id.* "Rather, the duties of a trustee set out in the statute are rather sparse.  First, the trustee must receive a communication from a creditor or surety indemnified by the deed that the debt has become due, a default has occurred, and that a foreclosure sale is demanded." *Id.* at 495.  Section 38-1-3 has not been interpreted to require a trustee to investigate the validity of the underlying obligation.

Based upon the above, this Court concludes that Wittenberg has failed to present a genuine issue of material fact that Seneca failed to perform its "rather sparse" duties.  First, Wittenberg does not dispute that she defaulted on her loan and that the Deed of Trust provides for the invocation of the power of sale.  Second, Wittenberg disputes neither that Seneca received a communication from Wells Fargo that she had defaulted nor that a foreclosure sale was scheduled as demanded.  Accordingly, this Court hereby **DISMISSES** Count VII (Breach of Fiduciary Duty).

### ii.    Count XIII – Declaratory Judgment

In Count XIII, which names MERS, U.S. Bank, BofA, and Seneca, Wittenberg seeks a declaration that "the Deed of Trust currently encumbering [her] property to be null and

void and to order such Deed of Trust and all related fillings to be removed from the land records." ([Doc. 65] at ¶ 219).  In support of this request, Wittenberg alleges that "[t]he negotiable instruments for [her] loan are not enforceable because the note was securitized and, therefore, is subject to and governed by a Pooling and Servicing Agreement ('PSA')." (Id. at ¶ 209).

On April 11, 2011, this Court dismissed this claim to the extent that it was requested against MERS and U.S. Bank, rejecting Wittenberg's argument that the securitization of her loan rendered her Note unenforceable.  For the same reason, this Court dismissed this claim against BofA on May 5, 2011.  Now, on the same basis and finding that there is no genuine issue of material fact precluding summary judgment, this Court hereby **DISMISSES** Count XIII (Declaratory Judgment) to the extent that it asks for the same relief against Seneca.

### iii.    Count VI – Fraud

In Count VI, Wittenberg claims that she was defrauded by Seneca, which she alleges fraudulently misrepresented that it had the authority to foreclose on her property. ([Doc. 65] at ¶ 162).

On April 11, 2011, this Court dismissed an identical fraud claim against MERS finding that Wittenberg had no damages because her property had not been foreclosed. After discovery, it is undisputed that Seneca has not foreclosed on Wittenberg's property. In fact, the evidence shows that Seneca has continued the foreclosure sale on several occasions and ultimately cancelled the sale on July 13, 2010.  As such, assuming without finding that Seneca lacked authority to foreclose, this Court concludes that Wittenberg has failed to present a genuine issue of material fact that a representation to the contrary has

35

caused her damages sufficient to allow a claim of fraud to go to a jury.  Accordingly, this Court hereby **DISMISSES** Count VI (Fraud) to the extent that it relates to Seneca's representation regarding its authority to foreclosure.

### iv.    Count IX –   Fraudulent, Deceptive, or Misleading Representations

In Count IX, Wittenberg claims that each letter sent by Seneca "alleged a delinquency in her mortgage is a separate fraudulent, deceptive or misleading representation of the character, extent or amount of [the] claim against [her]," in violation of W.Va. Code § 46A-2-127(d). ([Doc. 65] at ¶ 187).  This claim, like the claim for breach of fiduciary duty, is based upon the theory that the March 21, 2006, Note is invalid.  Thus, Wittenberg asserts that Seneca's representations that it was entitled to foreclose were false representations of the character of the claim against her because Seneca did not possess a valid note to initiate the foreclosure process.

Article 2, Section 127 of the WVCCPA, provides that "[n]o debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers."  W.Va. Code. § 46A-2-127.  The section then gives as an example "[a]ny false representation or implication of the character, extent or amount of a claim against a consumer, or of its status in any legal proceeding."  W.Va. Code § 46A-2-127(d).

Here, Wittenberg bases her claim of falsity upon the premise that Seneca made representations that it was entitled to foreclose on a note which she claims is invalid.  However, as explained above, a trustee in West Virginia does not have a duty to investigate the validity of a note.  *See **Lucas***, 618 S.E.2d at 497; W.Va. Code § 38-1-3.  Instead, a

trustee acts upon the demand of a creditor.  Thus, because Seneca was not required to conduct an independent investigation into the validity of the March 21, 2006, Note, it cannot be reasonably said to have made a false representation as to that validity.  As such, Wittenberg's claim fails as a matter of law.  Accordingly, this Court hereby **DISMISSES** Count IX (Fraudulent, Deceptive, or Misleading Representations) to the extent that it is alleged against Seneca.

### 2.      Claims vs. SIW (Debt Collector)

### i.      Count X – FDCPA

In Count X, Wittenberg claims that SIW violated the FDCPA by failing to verify her debt and by making false, deceptive, or misleading representations in connection with the collection of her debt.  The Court will consider each claim in turn.

### a.      Validation of Debt

Wittenberg first claims that SIW "continued collection activities without providing verification of the debt to [her] after she requested verification of the debt in writing, in violation of 15 U.S.C. § 1692g(b)."  ([Doc. 65] at ¶ 192).

Pursuant to § 1692g(a) of the FDCPA, a debt collector must send the consumer a written notice containing, among other things, "a statement that if the consumer notifies the debt collector in writing within the thirty-day period that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or . . . a copy of such verification . . . will be mailed to the consumer by the debt collector."  15 U.S.C. § 1692g(a)(4).  Pursuant to § 1692g(b), "[i]f the consumer notifies the debt collector in writing within the thirty-day period described in subsection (a) that the debt, or any portion thereof, is disputed . . . , the debt collector shall cease collection of the debt, or any disputed portion

thereof, until the debt collector obtains verification of the debt . . . and a copy of such verification . . . is mailed to the consumer by the debt collector."  15 U.S.C. § 1692g(b).

Here, Wittenberg claims that SIW continued collection efforts without verifying her debt, in violation of § 1692g(b).  Insofar as it is undisputed that SIW faxed Wittenberg's counsel a copy of the March 21, 2006, Note and a complete payment history to verify the debt, this Court can only assume that Wittenberg claims such verification was insufficient because the March 21, 2006, Note is allegedly invalid.

In the Fourth Circuit, however, "verification of a debt involves nothing more than the debt collector confirming in writing that the amount being demanded is what the creditor is claiming is owed . . .."  ***Chaudhrey v. Gallerizzo***, 174 F.3d 394, 406 (4th Cir. 1999). In addition, other courts have specifically held that verification of a debt does not obligate a debt collector to investigate whether the debt is valid.  *See **Poulin v. The Thomas Agency***, 760 F.Supp.2d 151, 159 (D.Me. 2011); ***Clark v. Capital Credit & Collection Servs., Inc.***, 460 F.3d 1162, 1174 (9th Cir. 2006); ***Rudek v. Frederick J. Hanna & Assocs., P.C.***, 2009 WL 385804, *2 (E.D. Tenn. Feb. 17, 2009); ***Shapiro v. Haenn***, 222 F.Supp.2d 29, 44 (D. Me. 2002).  At bottom, "confirmation of the amount of the debt and the identity of the creditor, which is then relayed to the debtor, is sufficient."  ***Poulin***, 760 F.Supp.2d at 159 (citing ***Chaudhrey***, 174 F.3d at 406).

Therefore, this Court concludes that § 1692g(b) did not require SIW to investigate the validity of the March 21, 2006, Note provided by Wells Fargo and which SIW then relayed to Wittenberg.  Wittenberg's § 1692g(b) claim thus fails as a matter of law. Accordingly, this Court hereby **DISMISSES** Count X (FDCPA) to the extent that it claims a violation of § 1692g(b).

### b.        False, Deceptive, or Misleading Representation

Wittenberg next claims that each of SIW's demands for payments which were not due was a false representation of the character, amount, or legal status of a debt, in violation of the FDCPA, 15 U.S.C. § 1692e(2)(A).  ([Doc. 65] at ¶ 191).

Pursuant to § 1692e of the FDCPA, "a debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  The false representation of "the character, amount, or legal status of any debt" is a violation of § 1692e(2)(A).

Here, Wittenberg argues that SIW falsely represented the character of legal status of a debt by providing her with what she claims is an invalid March 21, 2006 Note, for proof of its entitlement to collect her debt.  However, "[t]he FDCPA does not require a debt collector to engage in an independent investigation of the debt referred for collection." *Sayyed v. Wolpoff & Abramson, LLC*, 733 F.Supp.2d 635, 646 (D. Md. 2010) (citing *Jenkins v. Heintz*, 124 F.3d 824, 834 (7th Cir. 1997) (holding that a debt collection has no obligation to conduct an independent debt validity investigation); *Elane v. Revenue Maximation Group*, 233 F.Supp.2d 496, 500 (E.D.N.Y. 2002) (noting that defendant was entitled to rely on its client's representation that the debt was valid)).

Like the § 1692g(b) claim, therefore, this claim cannot be based upon SIW's alleged failure to investigate the validity of the March 21, 2006, Note.  Wittenberg's § 1692e(2)(A) claim thus fails as a matter of law.  Accordingly, this Court hereby **DISMISSES** Count X (FDCPA)  to the extent that it claims a violation of § 1692e(2)(A).

### ii.        Count VI – Fraud / Count XII – Slander of Title

In Count VI, Wittenberg claims that she was defrauded by SIW, which she alleges

39

created fraudulent Substitution of Trustee documents. ([Doc. 65] ¶ 162). In Count XII, Wittenberg claims that SIW's recording of the Substitution of Trustee documents constituted a slander to the title to the her property because SIW knew or should have known that those documents "contained false statements as to the owner of the note and the beneficial owner of the Deed of Trust." (Id. at ¶¶ 202-203).

SIW did not move to dismiss these claims, which have not been further developed after discovery. The only context for these claims is Wittenberg's allegation that "[b]ecause the 2006-Trust has no ownership interest in the March 21 Note (or any other note that may be subsequently be [sic] found), it has no authority to appoint Seneca Trustee as substitute trustee under the Deed of Trust." ([Doc. 65] at ¶ 93). In this context, this Court can only assume that this claim is based upon Wittenberg's general theory that the securitization of her loan was unlawful, as alleged most extensively in Count XII. Because this Court has already rejected that theory, these claims must fail as a matter of law for the same reasons previously explained in this Court's April 11, 2011, Memorandum Opinion and Order. Accordingly, this Court hereby **DISMISSES** Count VI (Fraud) and Count XII (Slander of Title) to the extent alleged against SIW.

### iv.   Count IX –   Fraudulent, Deceptive, or Misleading Representations

In Count IX, Wittenberg claims that each letter sent by SIW "alleging a delinquency in her mortgage is a separate fraudulent, deceptive or misleading representation of the character, extent or amount of [the] claim against [her]," in violation of W.Va. Code § 46A-2-127(d). ([Doc. 65] at ¶ 187). Again, Wittenberg bases this claim solely upon the theory that the March 21, 2006, Note is invalid. As such, Wittenberg claims that SIW falsely

represented that it was entitled to collect on a valid note.

In dismissing Wittenberg's identical claim under the FDCPA, this Court joined several courts in holding that the FDCPA did not require a debt collector to investigate the validity of the debt it has been asked by a creditor to collect.  Wittenberg has not presented, and this Court has been unable to find, any authority that would persuade this Court to treat this WVCCPA claim differently from her FDCPA claim.  As such, this Court holds that SIW could not have violated W.Va. Code § 46A-2-127(d) based upon Wittenberg's invalidity theory because SIW was not required to conduct an independent investigation into the validity of the March 21, 2006, Note.  Accordingly, this Court hereby **DISMISSES** Count IX Fraudulent, Deceptive, or Misleading Representations) to the extent that it is alleged against SIW.

### 3.    Civil Conspiracy Claim vs. Seneca and SIW

In Count III, titled "Common Law Civil Conspiracy," Wittenberg claims that Seneca and SIW "acted together in an attempt to unlawfully foreclose on [her] property."  ([Doc. 65] at ¶ 142).

In West Virginia, "[a] civil conspiracy is not a *per se*, stand-alone cause of action; it is instead a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)."  ***Dunn v. Rockwell***, 225 W.Va. 43, 57, 689 S.E.2d 255, 269 (2009) (citing ***Kessel v. Leavitt***, 204 W.Va. 95, 129, 511 S.E.2d 720, 754 (1998)).

To the extent that no viable tort claim remains in this action against Seneca and SIW, any claim of civil conspiracy fails as a matter of law.  Accordingly, this Court hereby **DISMISSES** Count III (Civil Conspiracy).

41

**D.    Wittenberg Motion for Partial Summary Judgment**

In Count IX, Wittenberg claims that each of the letters sent by Seneca and SIW on behalf of Wells Fargo "alleging a delinquency in her mortgage is a separate fraudulent, deceptive or misleading representation of the character, extent or amount of [the] claim against [her]," in violation of W.Va. Code § 46A-2-127(d). ([Doc. 65] at ¶ 187). Specifically, Wittenberg alleges that she received "foreclosure notices sent to her by Wells Fargo," that "Wells Fargo sent [her] foreclosure notices referencing a different loan number [than on the DOT]," and that she received "several notices from Defendant Samuel I. White, PC stating that it had been retained by defendant Wells Fargo to institute foreclosure proceedings . . .." (Id. at ¶¶ 70, 104, 106).

On April 11, 2011, this Court dismissed Count IX as it pertains to Wells Fargo on two alternative bases:

> First, the plaintiff has failed to allege that she was not delinquent on her loan payments. In fact, she admits that she was three months behind, though she alleges that she stopped making payments in reliance upon statements by a Wells Fargo representative. (See [Doc. 65] at ¶ 51). If, according to her own allegations, the plaintiff was delinquent, then the foreclosure notices could not have been fraudulent, deceptive, or misleading as a matter of law.
>
> Moreover, to the extent the plaintiff argues that any claim of delinquency was fraudulent, deceptive, or misleading because she only became delinquent in reliance upon representations made by Wells Fargo during a potential loan modification, her claim is preempted . . . by the NBA[.]

([Doc. 94] at 24-25).

On November 7, 2011, Wittenberg filed the instant Motion for Partial Summary

42

Judgment against Wells Fargo, asking this Court to reinstate, and grant her summary judgment on, Count IX.  With regard to the first basis, Wittenberg argues that the false representations she claimed concerned the validity of the March 21, 2006, Note, not whether she was behind on payments.  In other words, Wittenberg claims that Wells Fargo violated W.Va. Code § 46A-2-127(d) by falsely representing to her, directly through its representatives or indirectly through Seneca and SIW, that it was entitled to collect on the March 21, 2006, Note.  As for the second basis, Wittenberg argues that this Court would no longer find Count IX preempted by the NBA after its decision in *O'Neal v. Capital One Auto Finance, Inc.*, 2011 WL 4549148 (N.D. W.Va. Sept. 29, 2011).  For each of the independent reasons that follows, this Court finds that reinstatement is unwarranted.

Reinstatement would be unduly prejudicial to Wells Fargo at this stage.  Specifically, during the seven-month period between dismissal of Count IX and this motion, Wells Fargo had no reason to believe, let alone notice, that it would have to defend against Count IX.  Importantly, discovery had been closed for two weeks at the time this motion, the first indication that Wittenberg intended to request reinstatement of Count IX against Wells Fargo, was filed.

Reinstatement would ignore Wittenberg's failure to practice due diligence.  After the April 11, 2011, decision, Wittenberg failed to move to alter or amend this Court's judgment within 28 days pursuant to Rule 59 of the Federal Rules of Civil Procedure to clarify that Count IX was based upon her challenge of the validity of the March 21, 2006, Note, not that she was actually behind on payments.  As clarified, that claim may have escaped NBA preemption.  Moreover, Wittenberg waited until five weeks after this Court's *O'Neal* decision to move for reinstatement.

43

Reinstatement would be futile because Wittenberg has not presented a genuine issue of material fact that she can succeed against Wells Fargo on Count IX based upon the theory that the March 21, 2006, Note is invalid.  First, Wittenberg does not dispute the following facts: (1) she promised to pay First Independent (or its assignees or successors) $416,000 at an initially fixed interest rate of 5.875% over a term of 30 years; (2) she immediately received substantial benefit from this refinance loan, namely her home loan and another personal loan were paid off and she received over $100,000 in cash; and (3) she has not made a regular payment on this loan since December 2008, over three years ago.  Second, Wittenberg has failed to present a genuine issue as to the existence of a note dated March 27, 2006.  Nor has she presented a genuine issue of material fact that, assuming its existence, the other note contained terms that differ from the uniform Fannie Mae March 21, 2006, Note.  Third, Wittenberg does not dispute that after receiving a copy of March 21, 2006, Note, which she now claims is invalid, she nevertheless sought a modification of its terms. In fact, she actually made three payments toward the March 21, 2006, Note as part of a trial modification governed by a written Special Forbearance Agreement that she fully reviewed and signed.  *See **Potesta v. United States Fid. & Guar. Co.**, 202 W.Va. 308, 316, 504 S.E.2d 135, 143 (1998) (explaining the doctrine of estoppel). Therefore, Wittenberg has failed to present a genuine issue of material fact that she can succeed against Wells Fargo on Count IX based upon the theory that the March 21, 2006, Note is invalid.

For these reasons, this Court finds that reinstatement of Count IX against Wells Fargo is unwarranted.

## **CONCLUSION**

For the foregoing reasons, this Court concludes that Wittenberg's Motion for Partial Summary Judgment against Defendants Samuel I. White, P.C. and Seneca Trustees, Inc. **[Doc. 127]** and Motion for Partial Summary Judgment against Defendant Wells Fargo Bank, N.A. **[Doc. 133]** should be, and hereby are, **DENIED**.   In addition, this Court concludes that Wells Fargo's Motion for Summary Judgment **[Doc. 129]** and Seneca's and SIW's Motion for Summary Judgment **[Doc. 130]** should be, and hereby are, **GRANTED**. Accordingly, Wittenberg's First Amended Complaint **[Doc. 65]** is hereby **DISMISSED WITH PREJUDICE** and this matter is **ORDERED STRICKEN** from the active docket of this Court. Finally, the Clerk is directed to enter judgment in favor of the defendants.

It is so **ORDERED**.

The Clerk is hereby directed to transmit copies of this Order to counsel of record.

**DATED**: February 10, 2012.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE

45